UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

DAMON SCOTT                                                                                    PLAINTIFF

vs.                                                      CIVIL ACTION NO. 3:19-CV-844-CRS

HAIER U.S. APPLIANCE
SOLUTIONS, INC.                                                                            DEFENDANT

**MEMORANDUM OPINION**

This matter is before the Court on the motion of the Defendant, Haier U.S. Appliance Solutions, Inc. ("Haier"), for summary judgment. DN 22. Plaintiff, Damon Scott ("Scott"), responded in opposition to the motion. DN 23. Haier then filed a reply. DN 24. The matter is now ripe for review.

For the reasons stated herein, Haier's motion for summary judgment will be granted.

**I. BACKGROUND**

Scott, an African American male, began working for GE Appliances ("GEA"), a home appliance manufacturer that is majority owned by Haier, as a second-shift production worker in August 2014. DN 22-2 at 14 (pg. 53-54). Three years later, Scott was promoted to serve as a team leader for the second shift. DN 22-2 at 21 (pg. 81). In this capacity, Scott supervised roughly twenty employees and was responsible for "learning all the jobs" in his area, "cover[ing] for . . . breaks and stuff," training employees to perform the jobs he oversaw, "coach[ing] PPE and things of that sort," and delegat[ing] . . . different tasks and situations." DN 22-2 at 21 (pg. 84), 23 (pg. 92).

A. GEA's Relevant Policies and Procedures

As part of his employment, Scott received copies of GEA's employee policies and procedures, including GEA's Fair Employment Commitment Policy and GEA's Rules of Conduct. DN 22-2 at 15 (p. 57), 16 (p. 63), 17 (p. 65-66). The Fair Employment Commitment Policy provides, in part, that:

> GE Appliances ("the Company") is an equal opportunity employer and is committed to fair employment practices. In accordance with applicable law, the Company prohibits harassment and discrimination against employees, applicants for employment, and individuals providing services to GE Appliances based on their race, religion, religious creed, color, national or ethnic origin, ancestry, physical or mental disability, medical condition, genetic information, marital status, sex (including pregnancy), gender (including gender identity and expression), age, sexual orientation, military and veteran status and any other consideration protected by federal, state or local law ("protected characteristics").
>
> GE Appliances is committed to providing a work environment free from unlawful harassment and discrimination based on any protected characteristics. As a result, the Company maintains a strict policy prohibiting harassment, including sexual harassment, and discrimination against employees, applicants for employment, and individuals providing services to GE Appliances on any legally recognized basis, including, but not limited to all of the protected characteristics listed above.
>
> GE Appliances will not tolerate retaliation against any employee or applicant for making a good faith complaint of discrimination or harassment (either to GE Appliances or to a government agency), opposing such conduct, or for cooperating in such an investigation (either an investigation conducted by GE Appliances or an investigation, proceeding, or hearing conducted by a government enforcement agency or under GE Appliances Alternative Dispute Resolution procedures).

DN 22-4 at 1-2. In addition to these commitments, the Fair Employment and Commitment Policy (1) summarizes the process to submit a written or verbal report of harassment, discrimination, or retaliation, (2) discusses GEA's confidential investigative process, and (3) explains that employees

2

may file claims of unlawful harassment or discrimination with the Equal Employment Opportunity Commission ("EEOC"). DN 22-4 at 1-3.

Similarly, GEA's Rules of Conduct contains guidelines "to make . . . Appliance Park a safe, pleasant place to work, and to help ensure fair and consistent treatment of all employees." DN 22-3 at 1. To effectuate this objective, the Rules of Conduct outline disciplinary procedures for warning notices, concerted work interferences, and serious discipline offenses. DN 22-3 at 1-2. Warning notices are "the basic form of discipline used at Appliance Park" and are issued for offenses such as "[e]xcessive absenteeism or tardiness," "[e]arly quitting," "[l]oafing or abuse of Company time," "[l]eaving work area during working hours without permission," "[f]ailure to follow instructions from Company management or Security," "[c]areless workmanship," "making scrap unnecessarily or spoilage due to negligence," and "[m]inor violations of safety rules."[1] DN 22-3 at 1. If an employee receives three warning notices within a twelve-month period, he or she is subject to "a week's disciplinary time off." DN 22-3 at 1. "Recurring misconduct resulting in four written warning notices will result in discharge." DN 22-3 at 2. For a warning notice to become "inactive," an employee must not receive any additional warning notices within a twelve-month period. DN 22-3 at 1, 2.

**B. Relevant Events**

In the fall of 2018, Scott voluntarily transitioned to serve as a team leader for the third shift "[b]ecause the line was moving to third shift." DN 22-2 at 23 (pg. 91), 31 (pg. 123), 32 (pg. 127). Shortly thereafter, Paula Hicks ("Hicks"), an African American female, began serving as the third

---

[1] GEA's Rules of Conduct contain five safety rules. DN 22-3 at 1. The relevant safety rules require, that employees, among other things, "[r]eport to work wearing apparel that is compliant with Appliance Park Dress Code for manufacturing areas" and "[u]tilize required safety devices, tools, and equipment recommended or required for your area including safety glasses, other personal protective equipment (PPE), interlock devices, etc." DN 22-3 at 1.

3

shift P2 manager and supervised over one hundred employees, including Scott. DN 22-2 at 24 (p. 93), 31 (pg. 123).

Not long after Hicks undertook her managerial role, Scott contends that Hicks began "messing with [him]." DN 22-2 at 34 (pg. 134). Specifically, he testified that Hicks "harassed" and "bullied" him by "yelling at [him]" to "get [the line] working," "threatening disqualification," "staring at him," "giving [him] unreal expectations," "blaming [him] for things that wasn't [his] fault," and making it "a point to point out [his] errors." DN 33 (pg. 132), 34 (pg. 133-136), 35 (pg. 137). Scott stated that he informed Ron Pollard ("Pollard"), another GEA manager, and Tanesha, a union representative for the third shift, about Hicks' alleged behavior shortly after it began[2], but conceded that he did not did not share his complaints with GEA's human resource department or explain that the alleged harassment occurred because of his race. DN 22-2 at 34 (pg. 133-135), 37 (pg. 146-147), 38 (pg. 150), 39 (pg. 153).

Scott received his first warning notice from Hicks on February 24, 2019 for failing to "call in 15 minutes before [his] shift."[3] DN 22-2 at 39 (pg. 155), 22-5 at 7. Scott does not dispute that he clocked in late on that day and testified that he did not have an objection to the warning notice despite his misunderstanding that employees were no longer permitted to use paid time off to cover any tardiness. DN 22-2 at 39 (pg. 156), 40 (pg. 157), 43 (pg. 171), 44 (pg. 173).

The next day, Hicks issued Scott a second warning notice for not wearing "sleeves (arm guards)" in the Phase 3 area. DN 22-2 at 40 (pg. 157-158), 22-5 at 5. Although Scott admits he was not wearing sleeves/arm guards when he "walked over to Phase 3 . . . to say something to [his]

---

[2] Neither Scott's deposition nor other documents in the record indicate what outcome, if any, resulted from these conversations.
[3] The record evidences that Scott received a warning notice in 2017 for "excessive absenteeism" as well as a notice of disqualification in 2018 from Tommy Hodge. DN 22-1 at 24 (pg. 94-95), 25 (pg. 98-100), 22-5 at 8. However, neither of these notices form part of the underlying facts related to Scott's present lawsuit.

4

employee," he disputes the warning notice, claiming that he was "not in the area that required sleeves" when he spoke to the employee because he stayed in the adjacent "locker area." DN 22-2 at 40 (pg. 158-160), 41 (pg. 161-162).

On February 28, Scott received his third warning notice from Hicks for not wearing "sleeves [] in the Phase 3 area." DN 22-2 at 44 (pg. 174), 22-5 at 4. Scott similarly disagrees with the basis for this warning notice because he "does not remember doing it" or being in an area that required personal protective equipment ("PPE"). DN 22-2 at 44 (pg. 176), 45 (pg. 177-178). In fact, he testified that Hicks "made this stuff up, and [] falsified documents on [him]." DN 22-2 at 45 (pg. 179). Despite his objection and a grievance that was filed by his Union to remove the warning notice from his file, Scott was suspended without pay in accordance with GEA's Rules of Conduct from March 3 to March 10 because this was his third warning notice within a twelve-month period. DN 22-2 at 46 (pg. 182), 22-5 at 4, 23-3 at 2.

Three days after returning to work, Scott received his fourth warning notice for "[m]isuse of [c]ompany [t]ime" because he "did not return from [his] break on time." DN 22-2 at 46 (pg. 183), 22-5 at 2. Scott testified that he should not have received a warning notice on this occasion because he timely returned from his break to start the line, and then asked Craig, a second-shift team leader, to cover for him while he went to the restroom. DN 22-2 at 46 (pg. 184), 47 (pg. 185-187). Nevertheless, Hicks recommended Scott for termination based on GEA's Rules of Conduct considering that this was his fourth written notice in the past twelve months. DN 22-5 at 2.

The next day, Scott filed a Charge of Discrimination form with the EEOC, alleging discrimination based on his race, sex, and retaliation. DN 23-4 at 2. According to this document, Scott "began being subjected to different terms and conditions of employment by . . . Hicks . . . in January 2019, [including], but not limited to "being spoken to harshly," "being singled out,"

5

"receiving write-ups," and "not [receiving] a reason for the different terms and conditions of employment." DN 23-4 at 2.

On May 7, Scott's present counsel filed a Charge of Discrimination form with the EEOC on Scott's behalf. DN 22-2 at 52 (pg. 206-207), 24-2 at 2. Like Scott's earlier charge of discrimination, this document alleges that "in or around January 2019, [Scott] began being subjected to difference [sic] terms and conditions of his employment by his supervisor, [] Hicks, to include, but not limited to, being spoken to harshly and being singled out." DN 24-2 at 2. Unlike Scott's earlier charge, though, this document asserts that Scott filed his initial EEOC form before he received his fourth warning notice[4] and that "[t]he actions for which [Scott] has been disciplined for have not resulted in discipline for similarly situated individuals." DN 24-2 at 2. The record does not indicate whether Hicks, Hollinger, or anyone else at GEA learned about Scott's charges of discrimination and Scott testified that he "[had] no knowledge GEA even received [them]." DN 22-2 at 55 (pg. 217).

Scott met with Latiece Hollinger ("Hollinger"), the Human Resources Manager, Hicks, and Kesha P., on May 17 to discuss his fourth warning notice and the possibility of termination. DN 22-2 at 56 (pg. 221), 22-5 at 2. After the parties discussed the incident, Hollinger opted against termination and decided to "grant [Scott] another chance." DN 22-5 at 2. However, Hollinger informed Scott that he could not "have any additional warning notices within a 12-month period or he [would] be up for termination." DN 22-5 at 3.

Despite Hollinger's heed, Scott received another warning notice for a PPE violation on February 14, 2020, because he "was not wearing black sleeves in Tub Structure." DN 22-5 at 1.

---

[4] Scott testified that he did not learn about his fourth warning notice until April even though "3/13/2019" is listed as the date for the incident. DN 22-2 at 53 (pg. 212), 54 (pg. 213-214), 22-5 at 2. This very well may be true given that "4/16/19" is the date listed beside the employee, union, and company signature lines. DN 22-5 at 2.

6

Although Scott admitted that black sleeves must be worn in certain areas of the tub structure, he testified that he should not have received this warning notice considering that he does not "get[] on the job without sleeves on in [his] area because [he] works in tub structure and [] knows the PPE rules." DN 22-2 at 49 (pg. 194-196), 50 (pg. 197-198).

Hicks subsequently recommended Scott for termination again in accordance with GEA's Rules of Conduct because this was his fifth warning notice within twelve months. DN 22-5 at 1. Before Hollinger or anyone else from GEA met with Scott to discuss his potential termination, Scott "decided to quit" because he felt that he "could no longer work there." DN 22-2 at 55 (pg. 219-220). He has not been employed since his resignation. DN 22-2 at 62 (pg. 246).

## II. **LEGAL STANDARD**

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In undertaking this analysis, the Court must view the evidence in a light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

The party moving for summary judgment bears the burden of establishing the nonexistence of any issue of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). A party can meet this burden by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the . . . presence of a genuine dispute." Fed. R. Civ. P. 56 (c)(1). This burden can also be met by demonstrating that the nonmoving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

"[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact which requires the denial of a summary judgment motion." *St. v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). The non-moving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

### III. <u>ANALYSIS</u>

Scott filed the instant action on November 18, 2019 because he "felt like he was about to be terminated."[5] DN 22-2 at 55 (pg. 218-219). His Complaint asserts two claims against Haier. First, he claims that Haier violated Title VII of the Civil Rights Act of 1964 and the Kentucky Civil Rights Act ("KCRA") by "subjecting him to different standards and unlawfully putting him on notice of his termination based on his race." DN 1 at 4. Second, he claims that Haier "retaliated against [him] by putting him on notice of termination following his [EEOC] filing." DN 1 at 4-5.

**A. Racial Discrimination**

Haier argues that Scott cannot establish a prima facie case of racial discrimination because he (1) did not suffer an adverse employment action and (2) has not demonstrated that he was treated differently than any similarly situated employee. DN 22-1 at 11-18, DN 24 at 1-7. On the other hand, Scott contends that he can establish a prima facie case for racial discrimination based on his identification of Caucasian employees who were treated differently. DN 23 at 6-8, 10-12.

---

[5] Scott later filed a similar lawsuit against Haier, which is currently pending before the United States District Court for the Western District of Kentucky. *See Scott v. Haier U.S. Appliance Solutions, Inc.,* Case No. 3:21-cv-141-BJB-RSE.

The KCRA is like Title VII and interpreted using the same standards. *See Smith v. Leggett Wire Co.*, 220 F.3d 752, 758 (6th Cir. 2000) ("Because Ky. Rev. St. Chapter 344 mirrors Title VII of the Civil Rights Act of 1964 [], we use the federal standards for evaluating race discrimination claims"). Title VII provides that:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).

To establish a discrimination claim, a plaintiff must either present direct evidence of discrimination or introduce circumstantial evidence that supports an inference of discriminatory intent. *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 572 (6th Cir. 2000). Scott does not offer any direct evidence of discrimination and concedes in his Response that "no direct evidence of discrimination exists in this case." DN 23 at 6. As such, we will apply the *McDonnell Douglas* burden-shifting approach to determine whether Haier is entitled to judgment as a matter of law. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973); *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 707 (6th Cir. 2006).

Under this framework, Scott initially bears the burden of demonstrating that "(1) he is a member of a protected class; (2) was qualified for the job; (3) suffered an adverse employment decision; and (4) was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees." *Newman v. Fed. Exp. Corp.*, 266 F.3d 401, 406 (6th Cir. 2001). If successful in this regard, the burden then shifts to Haier to "'articulate some legitimate, nondiscriminatory reason' for taking the challenged action." *Vaughn v. Watkins Motor Lines, Inc.*, 291 F.3d 900, 906 (6th Cir. 2002) (citing *Johnson*, 215 F.3d at 572). If Haier offers a

9

sufficient nondiscriminatory reason for its actions, the burden shifts back to Scott to "prove that the proffered reason was actually a pretext to hide unlawful discrimination." *Id*.

It is undisputed that Scott, as an African American, is a member of a protected class. The Court will assume for purposes of this analysis that Scott was also qualified for his job as a team leader.[6] The parties dispute whether Scott suffered an adverse employment action and whether he was treated differently than other similarly situated non-protected employees.

### 1. Adverse Employment Action

An adverse employment action has been defined by the Sixth Circuit as a "materially adverse change in the terms of [one's] employment." *White v. Burlington N. & Santa Fe R. Co.*, 364 F.3d 789, 797 (6th Cir. 2004), aff'd sub nom. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006). The Sixth Circuit has concluded that "[a] 'mere inconvenience or an alteration of job responsibilities' or a 'bruised ego' is not enough to constitute an adverse employment action." *Id.* (citing *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 886 (6th Cir. 1996)); *see also Bowman v. Shawnee State Univ.*, 220 F.3d 456, 462 (6th Cir. 2000) ("The Sixth Circuit has consistently held that *de minimis* employment actions are not materially adverse and, thus, not actionable"). Likewise, mere threats of alleged adverse employment action are generally not sufficient to satisfy this requirement. *Mitchell v. Vanderbilt Univ.*, 389 F.3d 177, 182 (6th Cir. 2004). Further, "[a] written reprimand, without evidence that it led to a materially adverse consequence such as lowered pay, demotion, suspension, or the like, is not a materially adverse employment action." *Creggett v. Jefferson Cty. Bd. of Educ.*, 491 F. App'x 561, 566 (6th Cir. 2012).

Here, even when the evidence is viewed in the light most favorable to Scott, it fails to show that he suffered a materially adverse change in the terms of his employment. Although it is

---

[6] Although Haier's Reply states that it "does not concede that Scott was qualified for his job," Haier fails to proffer any evidence or substantive argument to support its position. DN 24 at 2.

undisputed that Haier considered terminating Scott after he received his fourth warning notice within a twelve-month period, Hollinger ultimately decided "to grant him another chance." DN 22-5 at 2-3. Similarly, no adverse employment action was taken by Haier following Scott's receipt of a fifth warning notice within a twelve-month period considering that he voluntarily resigned "because he felt [like] the termination was coming." DN 22-2 at 68 (pg. 272). Moreover, Scott admitted during his deposition that GEA never demoted him, terminated his employment, decreased his pay, changed his shift, or altered his job responsibilities. DN 22-2 at 28 (pg. 110), 48 (pg. 191-192), 60 (pg. 237), 64 (pg. 255), 66 (pg. 262). Therefore, neither the warning notices Scott received nor the notices of termination that resulted from his conduct constitute sufficient adverse employment actions because they did not have a materially adverse effect on his salary or the status of his employment.

### 2. Similarly Situated Non-Protected Employees

Similarly, Scott "has offered no proof that a similarly situated [Caucasian] employee was treated differently." *Newman*, 266 F.3d at 406. A plaintiff "need not demonstrate an exact correlation with the asserted comparable employees receiving more favorable treatment in order for them to be considered 'similarly situated.'" *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998). However, the Sixth Circuit requires "the individuals with whom the plaintiff seeks to compare his/her treatment [to] have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992).

Here, Scott's Response identifies "Ray Last Name Unknown (LNU), Jared LNU, and all Caucasian employees shown in the video attached as Exhibit D [as] similarly situated, non-

protected employees . . . [that] were supervised by Hicks . . . [and] violated GEA's PPE policy without receiving the same immediate and public punishment that Scott received."[7] DN 23 at 7. He also testified during his deposition that he "noticed through [his] eyes" that Hicks disciplined African Americans more than she disciplined Caucasians, but could not provide any names or information about Caucasian employees that he believed avoided discipline for the same conduct that formed the basis of his warning notices. DN 22-2 at 35 (pg. 139).

These contentions and self-serving statements are not sufficient to overcome summary judgment. *See e.g., Strong v. Orkand Corp.*, 83 F. App'x 751, 753-54 (6th Cir. 2003) (plaintiff failed to establish that the individual he named as comparable was, in fact, treated differently than he was because identical action was taken against the named individual and the plaintiff did not provide affidavits or other evidence that he was treated differently than a similarly-situated non-minority employee); *Russell v. Univ. of Toledo*, 537 F.3d 596, 607 (6th Cir. 2008) (plaintiff failed to demonstrate that she was similarly situated to the individuals with whom she sought to compare herself because the other employees lacked prior disciplinary records); *Green v. CGI Techs. & Sols.*, 911 F. Supp. 2d 513, 521 (N.D. Ohio 2012) (plaintiffs failed to prove that the asserted similarly situated employees were similar in all relevant respects because they did not demonstrate their employment situation was similar or that they were treated less favorably than a similarly situated employee in an non-protected class). To avoid judgment as a matter of law, Scott must produce affirmative evidence that establishes he is similar in all relevant respects to some other non-protected employee(s). Considering that there is no evidence in the record that indicates these individuals (1) were supervised by Hicks, (2) shared the same job responsibilities as Scott, (3) had

---

[7] In resolving Haier's motion for summary judgment, the Court attempted to view the black, Memorex, 128GB thumb drive that was manually filed by Scot, which purports to contain video and audio recordings that support his opposition to Haier's motion for summary judgment. However, the thumb drive does not contain any files whatsoever.

similar discipline history, or (4) were not disciplined for engaging in similar conduct, we find that Scott failed to prove an essential element of his prima facie case.

Accordingly, Haier's motion for summary judgment will be granted with respect to Scott's claim for racial discrimination.

**B. Retaliation**

The Court will next address Scott's claim that he was retaliated against in violation of Title VII and the KCRA. Haier argues that Scott cannot establish a prima facie case of retaliation because (1) he has not provided the Court with evidence that Haier, Hicks, or Hollinger knew about his EEOC charge; (2) he did not suffer an adverse employment action; and (3) even if he suffered an adverse employment action, his subsequent warning notice is too remote in time to establish a causal connection. DN 22-1 at 18-23, 24 at 7-11. On the other hand, Scott contends that he can establish a prima facie case because (1) the EEOC notifies employers of a charge of discrimination within ten days of the charge being filed; (2) the issuance of a notice of termination following his charge of discrimination was an adverse employment actions; and (3) a causal connection exists between his protected activity and the adverse employment action. DN 23 at 8-10.

Like with Scott's racial discrimination claim, the Court will analyze Title VII and the KRCA under the same standard. *See Montell v. Diversified Clinical Servs., Inc.*, 757 F.3d 497, 504 (6th Cir. 2014) ("Retaliation claims under the KCRA are evaluated under the same standard as we use to evaluate federal Title VII claims"). Scott concedes in his Response that "no direct evidence of retaliation exists" and that his claim should be evaluated using the *McDonnell Douglas* burden-shifting framework. DN 23 at 8. Under that framework, Scott must show that he "(1) engaged in a protected activity, (2) [Haier] knew of [his] protected conduct, (3) [Haier] took an adverse

employment action against [him] after [his] protected conduct, and (4) there was a causal connection between the exercise of [his] protected right and the adverse employment action taken by [Haier]." *Id*. If Scott makes out his prima facie case, "the burden shifts to [Haier] to provide a legitimate, non-retaliatory reason for its action." *Id*. If Haier offers such an explanation, "the burden shifts back to [Scott] to put forward evidence from which a reasonable jury could conclude that the stated reason is merely pretextual." *Id*.

1. **Protected Activity**

The parties do not dispute that Scott engaged in protected activity when he filed charges of discrimination with the EEOC on March 14, 2019 and May 7, 2019. However, Haier opposes Scott's attempt to assert additional factual bases for his retaliation claim in his Response that were not articulated within his Complaint, namely that Scott "engaged in protected activity by filing a grievance with his Union representative and [Haier's] Human Resources Department," along with his complaints "to GEA management and Hick's supervisor, Pollard, on numerous occasions." DN 23 at 8, 24 at 7-8.

There are two types of protected activity under Title VII. The "opposition clause" of Title VII makes it "unlawful . . . for an employer to discriminate against any . . . employee[] . . . because he has opposed any practice made . . . unlawful . . . by this subchapter." 42 U.S.C. § 2000e–3(a). "Oppose" is not defined in Title VII and carries its ordinary meaning: "to resist or antagonize . . .; to contend against; to confront; resist; withstand." *Crawford v. Metro. Gov't of Nashville & Davidson Cty., Tenn.*, 555 U.S. 271, 276 (2009) (citing Webster's New International Dictionary 1710 (2d ed. 1958)). This includes "not only the filing of formal discrimination charges with the EEOC, but also complaints to management and less formal protests of discriminatory employment practices." *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014); *see also Trujillo v.*

*Henniges Auto. Sealing Sys. N. Am., Inc.*, 495 F. App'x 651, 655 (6th Cir. 2012), as amended (Oct. 17, 2012) ("We have repeatedly held that complaints to human resources personnel regarding potential violations of Title VII constitute protected activity for purposes of establishing a prima facie case of retaliation"). However, Tittle VII does not protect all opposition activity. "For the activity to be protected, a plaintiff must put her employer on notice that she is opposing a practice made unlawful by Title VII." *Scheske v. Univ. of Michigan Health Sys.*, 59 F. Supp. 3d 820, 827 (E.D. Mich. 2014); *see also Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1313 (6th Cir. 1989) ("An employee may not invoke the protections of the Act by making a vague charge of discrimination. Otherwise, every adverse employment decision by an employer would be subject to challenge under either state or federal civil rights legislation simply by an employee inserting a charge of discrimination").

The "participation clause" prohibits employers from retailing against an employee that has "participated in any manner in an investigation, proceeding or hearing under [Title VII]." 42 U.S.C. § 2000e–3(a). The Sixth Circuit has held that this clause "protects an employee's participation in an employer's internal investigation into allegations of unlawful discrimination where the investigation occurs pursuant to a pending EEOC charge." *Abbott v. Crown Motor Co.*, 348 F.3d 537, 543 (6th Cir. 2003). However, it does not "cover an employee's participation in an employer's internal, in-house investigation, conducted apart from a formal charge with the EEOC; at a minimum, an employee must have filed a charge with the EEOC or otherwise instigated proceedings under Title VII." *Hamade v. Valiant Gov't Servs., LLC*, 807 F. App'x 546, 550 (6th Cir. 2020) (internal citation and quotation marks omitted).

Here, Scott's conversations with GEA management about Hicks' alleged conduct and warning notices he received, as well as the grievance that was filed on his behalf, potentially

15

implicate the opposition clause. However, an examination of the record reveals that Scott was not contesting any unlawful employment practice (i.e., racial discrimination or retaliation) during these conversations; rather, he was objecting to Hicks' managerial style and the factual validity of his warning notices.

Scott testified that, shortly after Hicks became his supervisor, he complained to Pollard and Tanesha that Hicks "harassed" and "bullied" him by "yelling at [him]" to "get [the line] working," "threatening disqualification," "staring at him," "giving [him] unreal expectations," "blaming [him] for things that wasn't [his] fault," and making it "a point to point out [his] errors." DN 33 (pg. 132), 34 (pg. 133-136), 35 (pg. 137). Yet, a review of his deposition testimony and other documents in the record suggest that he never referenced his race or his EEOC charge during these conversations. DN 33 (pg. 132), 34 (pg. 133-136), 35 (pg. 137), 22-5 at 2-7.

Likewise, the grievance filed by Local Union 83761 on Scott's behalf does not reference his status as a member of a protected class. DN 22-3 at 2. Instead, it merely requests that one of Scott's warning notices be removed from his "work record . . . due to unjust discipline." DN 23-3. Thus, Scott's assertion that he engaged in protected activity by complaining to GEA's management about Hicks' alleged harassment, as well as the grievance his Union filed on his behalf, are not sustainable. *See e.g., Balding-Margolis v. Cleveland Arcade*, 352 F. App'x 35, 45 (6th Cir. 2009) (plaintiff failed to establish that she engaged in protected activity, despite making several complaints to management concerning general work-related issues, because there was no evidence that she objected to discriminatory conduct against her based on her membership in a protected class); *Curry v. SBC Commc'ns, Inc.*, 669 F. Supp. 2d 805, 832 (E.D. Mich. 2009) (plaintiffs failed to establish that they engaged in protected activity despite complaining about their manager's constant harassment because the complaints were never based on racial animus).

### 2. Haier's Knowledge of Scott's Protected Conduct

To satisfy the second prong of his prima facie case, Scott must demonstrate that those who took an adverse employment action or were meaningfully involved in an adverse action knew about his protected activity. *See Frazier v. USF Holland, Inc.*, 250 F. App'x 142, 148 (6th Cir. 2007) ("The decisionmaker's knowledge of the protected activity is an essential element of the prima facie case"). Although "direct evidence of [the decisionmaker's] knowledge or awareness is not required," Scott must present "sufficient evidence to support the inference that [the decisionmaker] knew of [the] protected activity." *Mulhall v. Ashcroft*, 287 F.3d 543, 552-53 (6th Cir. 2002) (discussing *Polk v. Yellow Freight System, Inc.*, 876 F.2d 527, 531 (6th Cir. 1989)).

The Sixth Circuit has previously inferred knowledge of protected activity in situations where the decisionmaker "took an action with respect to the plaintiff, other than the challenged adverse action, from which it could be inferred that the supervisor was aware of the plaintiff's grievance." *Id*. at 552. A decisionmaker's knowledge could also be inferred by a reasonable jury when a plaintiff produces evidence of statements that suggest the decisionmaker knew of the plaintiff's protected activity or "evidence of the prior interaction of individuals with such knowledge and those taking the adverse employment action . . . that . . . make it 'highly improbable' that the individual who knew of the plaintiff's protected activity did not share this information with the second individual who actually took the adverse employment action as soon as the first individual obtained the information." *Garrett v. Mercedes-Benz Fin. Servs. USA LLC*, 331 F. Supp. 3d 699, 715 (E.D. Mich. 2018) (citing *Mulhall*, 287 F.3d at 553).

Instead, of offering direct evidence to establish the knowledge element of his claim, Scott asks the Court to infer that the relevant decisionmakers, whom he does not identify, must have been on notice of his charges of discrimination because it is "EEOC policy to issue a notice of the

Charge to the employer within ten days of the Charge being filed." DN 23 at 9. But this circumstantial evidence, without more, is insufficient to show that Scott's charges of discrimination were brought to the attention of individuals that purportedly retaliated against him who possessed decision-making authority. *See Evans v. Pro. Transp., Inc.,* 614 F. App'x 297, 300 (6th Cir. 2015) (quoting *Mulhall*, 287 F.3d at 552) ("Circumstantial evidence can support a reasonable inference of the decisionmaker's knowledge if the evidence is comprised of "specific facts" and not merely "conspiratorial theories," "flights of fancy, speculations, hunches, intuitions, or rumors"); *see also Proffitt v. Metro. Gov't of Nashville & Davidson Cty., Tenn.,* 150 F. App'x 439, 443 (6th Cir. 2005) (finding plaintiff's evidence "too speculative to support the inference that the [decisionmaker] knew of her protected activity when she terminated her"); *Fenton v. HiSAN, Inc.*, 174 F.3d 827, 832 (6th Cir. 1999) (summary judgment was appropriate where plaintiff failed to "met her burden of showing that her protected activity was known to those who made [the] decision").

Likewise, there is no evidence that Hicks or Hollinger took an action from which a reasonably jury could infer that they were aware of Scott's protected activity. Although Hicks and Hollinger met with Scott after he filed his charges of discrimination with the EEOC, the contemporaneous notes taken by Hollinger do not evidence that Scott informed them about his EEOC charge. In fact, Scott testified that he had "no clue" if Hicks or Hollinger received notice of his filing. DN 22-2 at 54 (pg. 214-215), 55 (pg. 217). Therefore, Scott failed to create a genuine issue of material facts as to whether Haier or any decisionmaker knew about his protected activity.

### 3. Adverse Employment Action

Even if Scott could somehow prove the second element of his retaliation claim, he must also establish retaliatory conduct that amounts to an adverse employment action. Scott asserts that

Haier took an adverse employment action against him when Hicks issued "a fatal fourth warning notice" that resulted in "a notice of termination" after she "receiv[ed] notice of his EEOC Charge." DN 23 at 9.

The facts presented here indicate that Hicks issued Scott a warning notice on March 13, 2019 for "not return[ing] from break on time." DN 22-5 at 2. This was Scott's fourth warning notice within a twelve-month period. DN 22-5 at 2-7. According to GEA's Rules of Conduct, an employee's fourth warning notice "will result in discharge." DN 22-3 at 2. Even though Scott claims he received this document in April 2019, which very well may be true since all signatures are dated "4/16/19," this point is immaterial because the warning notice originated before his EEOC charge.[8] DN 22-5 at 2, 23-4 at 2, 24-2 at 2.

Scott then points to the termination meeting that was held on May 17, 2019 as retaliation for his EEOC charges of discrimination. DN 23 at 9. But the termination meeting was undoubtedly the inevitable next step in processing his fourth warning notice. Considering that this meeting was part of the termination process for a violation that occurred prior to his charges of discrimination, it could also not constitute retaliatory conduct. Moreover, the meeting was favorable rather than adverse because Hollinger decided that Scott should be given "another chance." DN 22-5 at 3. Therefore, although Scott's burden of establishing a materially adverse employment action is "less onerous in the retaliation context than in the anti-discrimination context," he cannot, as a matter of fact, establish that Haier took an adverse employment action against him in retaliation for protected activity.[9] *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 595-96 (6th Cir. 2007).

---

[8] Scott's Response also contends that he suffered an adverse employment action when he received his first, second, and third warning notice. Similarly, these warning notices cannot constitute adverse employment actions because they were issued prior to Scott's EEOC charge. *See* discussion infra Section III.B.1.

[9] The record evidences that Hicks recommended Scott for termination in February 2020 after he obtained another warning notice for violating GEA's PPE safety rules. DN 22-5 at 1. Importantly, Scott does not raise this warning notice as retaliatory conduct in his Complaint or in argument against summary judgment. However, we note, that if this action were to constitute an adverse employment action, there is a complete absence of evidence that any similarly

Accordingly, Haier's motion for summary judgment will be granted with respect to Scott's claim for retaliation.

## IV. CONCLUSION

For the reasons discussed herein, Haier's motion for summary judgment will be granted by separate order.

June 22, 2021

Charles R. Simpson III, Senior Judge
United States District Court

---

situated employee was treated differently or that there was a close temporal proximity between the fifth warning notice and Scott's protected activity. *See e.g., Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000) ("Although no one factor is dispositive in establishing a causal connection, evidence that defendant treated the plaintiff differently from similarly situated employees or that the adverse action was taken shortly after the plaintiff's exercise of protected rights is relevant to causation"); *Sharp v. Aker Plant Servs. Grp., Inc*., 600 F. App'x 337, 341 (6th Cir. 2015) ("To be sure, this court requires a very brief interval between protected activity and adverse action before it permits a plaintiff to demonstrate causation solely on the basis of temporal proximity. See Mickey, 516 F.3d at 524–25. But our precedent expressly rejects the district court's position that a span of more than six months between protected activity and adverse action categorically precludes finding causation").